# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 3430 | **DATE** | February 4, 2002 |
| **CASE TITLE** | *Levenstien v. Salafsky, et al.* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the defendants' motion for summary judgment is GRANTED in part and DENIED in part. The motion is GRANTED for the individual defendants and against Levenstein. However, defendants' motion is DENIED with respect to Levenstein's constitutional claims. IT IS SO ORDERED.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | FEB 06 2002 |
| | Docketing to mail notices. | docketing deputy initials |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | date mailed notice |
| RTS | courtroom deputy's initials | |

Document Number

19

CLERK U.S. DISTRICT COURT
02 FEB -5 PM 1: 26
FILED-EO 10

Date/time received in central Clerk's Office
mailing deputy initials

# THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
FEB 0 6 2002

JOSEPH H. LEVENSTEIN, M.D.    )
                       )
       Plaintiff,        )
                       )
       v.            )
                       )       97 c 3430
BERNARD SALAFSKY,      )
PATRICIA A. GILL, and     )
DAVID C. BROSKI,        )
in their official and personal   )
capacities,              )
                       )
       Defendants.     )

## MEMORANDUM OPINION AND ORDER

**BLANCHE M. MANNING, United States District Judge:**

Plaintiff Joseph H. Levenstein was a tenured medical school professor and administrator at the Rockford campus of the University of Illinois at Chicago who resigned in 1996. Bernard Salafsky, Patricia A. Gill, and David Broski, each are named as defendants in their individual as well as in their official capacities on behalf of the university. In his complaint, Levenstein alleges that the defendants violated his constitutional rights during an investigation into sexual harassment allegations against him. Specifically, he alleges that he was deprived of procedural of due process and equal protection within the meaning of the Fourteenth Amendment.

Defendants move for summary judgment on Levenstein's procedural due process and equal protection claims under Fed.R.Civ.P. 56. They also seek summary

judgment that they are entitled to qualified immunity. For the following reasons, the motion is DENIED in part and GRANTED in part.

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the non-moving party fails to make a sufficient showing on an essential element of his case, on which he would bear the burden of proof at trial, summary judgment is proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party, however, has the burden of establishing the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). As the non-moving party, Levenstein can avert summary judgment if he can show that there exists specific facts that would present a genuine issue for trial. *Celotex,* 477 U.S. at 324. A genuine issue exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248. He may not simply rely on the pleadings to rebut a proper showing that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 324. Rather, he must present new evidence to counter a properly established absence of material fact.

## I.    BACKGROUND

The following facts are derived from the parties' briefs, depositions, affidavits, and other documentary evidence.

### A.    *Levenstein's Background*

Levenstein practiced medicine in South Africa from 1969 to 1990. There, he published numerous articles and other works, served on several committees, and

worked as a visiting professor at more than a dozen universities around the world. As a result, Levenstein earned international recognition in the field of family and community medicine. He was recruited by the University of Illinois at Chicago and, in May 1990, Levenstein began his employment as a non-tenured professor and head of the Department of Family and Community Medicine at Rockford. In November 1990, the university named Levenstein the executive head of the Family and Community Medicine Departments for the four university campuses. In July 1992, the University awarded him tenure.

B.  *Levenstein's Suspicions of Fiscal Mismanagement*

Starting in or around August 1994, Levenstein formed a committee, the purpose of which was to act as a "watchdog" over funds generated, collected, and spent by the Rockford "medical service plan" – the mechanism for billing, collections, and disbursements flowing to and from the University at Rockford. The formulation of this committee, Levenstein believed, was appurtenant to his responsibilities as a department head, as he shared the responsibility of meeting the University's budget.

In April 1995, Levenstein inquired of several administrators, including Salafsky, about what he thought to be unexplained and mysterious financial losses and unspecified medical expenses in the Rockford financial records. Around this time, Levenstein also made requests for budgetary documents pertaining to all of the medical school departments. Most notably, Levenstein was quite vocal about the propriety of plans to construct a new medical clinic facility in Rockford. Levenstein believed that Salafsky was intimately involved with the planning of the new clinic and the appropriation of the funds to build it. He contends that the funds required for the project

3

were not available, yet the project went ahead in an underhanded way to evade University budgetary constraints. Levenstein contends that his concerns were ignored by Salafsky. The point Levenstein makes is that he was outspoken against the construction of the "grossly overpriced" new Rockford clinic and became suspicious of Salafsky. Levenstein contends that Salafsky was aware that Levenstein was an obstacle to the completion of the clinic.

C. *Levenstein's Suspension*

On May 11, 1995, Salafsky met with Levenstein and advised him that accusations of sexual harassment had been made against Levenstein. At the time, no formal complaints had been filed against him, but Salafsky anticipated them soon. At this meeting, Salafsky offered Levenstein the opportunity to resign, and said that if he chose not to, he would be suspended with pay pending an investigation of the allegations. The same day, upon Levenstein's refusal to resign, Salafsky wrote to Levenstein, formally notifying him of the suspension:

> Given a series of allegations of sexual harassment against you by women at this site, I am suspending you with pay effective 5:00 p.m. today, May 11, 1995.
> Under the terms of this suspension you are prohibited from entry into University facilities until this issue is resolved.
>
> The period of suspension will end following a complete hearing on this matter conducted by Ms. Patricia Gill, Special Assistant to University Legal Counsel, after which a course of action will be determined . . .

Salafsky states that he chose this course of action because he was concerned with what he described as "numerous complaints" about Levenstein from staff, faculty and students that had surfaced over the prior month. Also, defendants state that

4

accusations of sexual harassment by Levenstein dated back as far as when Levenstein started his employment at the University.

      D.    *History of Sexual Harassment Allegations Against Levenstein*

In fall of 1990, two female administrative workers in Levenstein's office complained about sexually inappropriate behavior by Levenstein. Both parties agree that Salafsky confronted Levenstein about these complaints shortly after they occurred, but they disagree about the severity of the warning Salafsky issued.

In fall of 1993, a female clerk/typist complained that Levenstein's comments and gestures contained inappropriate sexual overtones. In response, Salafsky contends that he instructed Patricia Gill, then Deputy Director for Equal Opportunity and Compliance, UIC Affirmative Action Program Offices to make a presentation on sexual harassment to Rockford administrators -- which Levenstein attended.

In October 1994, a female medical student expressed concerns to Marjorie Stearns, then assistant director of student affairs at Rockford, about Levenstein's behavior toward her, which included sexual remarks and inappropriate physical contact with her. She indicated to Stearns that she wanted to maintain her confidentiality. In April 1995, this student made an anonymous complaint against Levenstein to Gill.

In April/May 1995, informal complaints by two female faculty members of sexually inappropriate behavior by Levenstein came to the attention of Salafsky. Apparently, neither woman wished to make a formal complaint at that time. On May 8, 1995, two female support staff members, a secretary and a typist, came forth to a Rockford personnel officer and each made informal complaints of Levenstein's sexual harassment -- consisting of inappropriate remarks and touching. They indicated that

5

they wished to file formal complaints against Levenstein and were referred to Gill. On May 16, they contacted Gill and informed her that they wished to pursue formal complaints against Levenstein. Gill faxed them each a "Request for Action" form to complete. On that day or on May 17, the student who filed the anonymous complaint, bolstered by the actions of the two staff members, came forth to Gill and expressed interest in filing a formal complaint against Levenstein.

Salafsky contends that he was concerned about the number of complaints against Levenstein, concerned that his previous discussions with Levenstein in combination with Gill's presentation did not produce a change in Levenstein's behavior, and that Levenstein could influence an investigation into the sexual harassment charges against him since he supervised the two support staff members who made the most recent charges against him, and because Levenstein was attempting to discover the identity of the medical student who had voiced concerns about Levenstein to Stearns in October 1994. Because of these concerns, Salafsky contends that he decided to suspend Levenstein.

E.    *The University's Sexual Harassment Investigation Against Levenstein*

On May 21, 1995, the two support staff members in Levenstein's office and the formerly anonymous medical student filed formal complaints of sexual harassment against Levenstein. Gill received and reviewed the complaints. Gill made comments on the forms, which were incorporated into final briefs submitted by the complainants. Soon thereafter, Gill launched an investigation into the three formal complaints of sexual harassment against Levenstein. On May 24, 1995, Gill wrote Levenstein informing him that the three women had "filed a Request for Further Action" seeking an

investigation into their allegations. Gill's letter also described approximately fifteen alleged examples of Levenstein's conduct complained of by the women which described uninvited touching of the hands, neck, back, and rear end; his invasion of their personal space; crude statements which contained sexual overtones or were blatant come-ons.

Gill's letter informed Levenstein that because the allegations:

> if true, could violate UIC's policy prohibiting sexual harassment of our employees, Affirmative Action Programs ["AAP"] must proceed to investigate the claim. The first step of the process allows you to respond in writing to the allegations. It is asked that your response to the allegations be submitted within 10 calendar days from the date you receive this letter. In the event that a written response is not received, Affirmative Action Programs will proceed with the investigation by interviewing any individuals who can assist in establishing the facts.

On June 12, 1995, Levenstein's counsel responded to Gill's letter which denied any acts of sexual harassment and expressed sympathy for anyone who misperceived his conduct as harassment.

Between May 18 and July 17, Gill's investigation included interviews with twenty-one people, including the three complainants, Levenstein (accompanied by counsel), and people whom Levenstein suggested (evidently after he was apprised that an investigation was proceeding) might have knowledge to assist the investigation's just conclusion. Levenstein expressed frustration that Gill decided not to interview all of the witnesses he submitted for her consideration.

On July 23, 1995, Gill issued the conclusions of the AAP's investigation in a fourteen-page report. It recommended a finding that Levenstein violated the University's policy of sexual harassment and subjected "faculty, staff, and students" to

unwanted sexual gestures, conduct and remarks. The report also concluded that Levenstein "had sufficient basis" to know that his conduct was improper.

On July 28, Myrna C. Adams, the Associate Chancellor and Director of Affirmative Action Programs, wrote Levenstein the result of the investigation. The letter informed him that where a complaint of sexual harassment is found to be valid, she recommends appropriate relief and remedies. Thus, Adams stated it was her recommendation to not allow Levenstein to exercise authority over female subordinates or employees for a period of up to three years. Adams' letter stated that because the investigation did not reveal evidence that Levenstein was guilty of misconduct in the classroom or while treating patients, her recommendations did not extend to "classroom instruction, lecturing, or patient treatment. It should apply however, to teaching students in clinical or private setting." If it was not possible to create an arrangement for Levenstein to "fully perform" his job consistent with the recommendations, Adams recommended that Levenstein be terminated from employment.

F.    *Levenstein's Appeal of the University's Investigation and Recommendations*

On August 9, 1995, Levenstein wrote to David C. Broski, who then was interim Chancellor of the University, and appealed the findings of the investigation and Adams' recommendations. Thereafter, from a period beginning in August 1995 and continuing through November 1995, Levenstein participated in the appeal process, including testifying at an October 12 hearing before an appeals panel.

The panel conducted its own interviews of the complainants, made investigations, reviewed documents, and heard from witnesses. On November 20,

8

1995, the Faculty Appeal Panel issued a report which concluded that there was a sufficient factual basis to support the conclusion that Levenstein subjected faculty, staff and students to unwanted sexual contact, gestures, and statements that were offensive and/or humiliating. It concluded that the vast majority of allegations against Levenstein were supported by a sufficient factual basis. On a few of the allegations, the panel was unable to reach a conclusion or found the incidents too insignificant to warrant a finding of sexual harassment.

The panel rejected Levenstein's defenses to the allegations against him, chief among them that the complainants were not credible and that their stories were uncorroborated. Also, the panel rejected Levenstein's contention that the complainants were recruited or manipulated into making allegations against him and that Gill was predisposed to finding him guilty of the allegations as she conducted the AAP investigation. The panel stated that it just did not find credible Levenstein's accusations that the process had been tampered with.

The panel did not make recommendations about corrective action or sanctions. It did, however, take note of mitigating and aggravating factors in Levenstein's case. In its view, the aggravating factors included the fact that Levenstein had previously been warned about his inappropriate behavior, apparently to no avail. The mitigating factors in favor of Levenstein included: the support he received from many colleagues, his record of achievement, and testimony from witnesses who had never seen Levenstein behave inappropriately. Thus, Levenstein's appeal of the AAP findings of sexual harassment was denied.

G. *Seeking Levenstein's Termination from the University*

    1. <u>Salafsky Gets the Ball Rolling for Levenstein's Termination</u>

On December 12, 1995, a little more than three weeks after Levenstein's appeal was denied, Salafsky wrote to Jerry Moss, who was Dean of UICOM. Salafsky recommended that Levenstein be "removed from the faculty of the University" for due cause. Salafsky stated that he believed "the findings of the [AAP] relative to allegations of sexual harassment as stated by Myrna Adams . . . and the subsequent re-affirmation of these findings by an Appeals Panel . . . form the basis of dismissal." Addressing Adams' recommendation that the suspension against Levenstein should not extend to classroom instruction, lecturing or patient treatment, and should not last more than three years in any event, Salafsky stated that dismissal was nevertheless the appropriate course of action because he did not believe Adams' proposed solution could be realized.

Salafsky arrived at this conclusion because, in the classroom, students often seek out their instructors for "one on one clarification" which Salafsky thought could potentially pose a risk for female students. Patient treatment, Salafsky added, "involves nurses, particularly where female patients are undergoing examination, and usually involves interaction with clerical staff." Thus, "in my view," Salafsky wrote, "it is quite impossible to place Dr. Levenstein in a teaching, research, or clinical position where he would not have some sort of supervisory responsibility or be in a position of authority which he could again abuse."

Moss reviewed Salafsky's recommendation and concurred with it. On December 13, Moss wrote Broski requesting that he "proceed with the removal of Dr. Levenstein from the faculty of the University of Illinois." On December 21, 1995, Broski wrote President James Stukel, to recommend that dismissal proceedings be commenced against Levenstein. The same day, B. also wrote Levenstein and advised him that "effective immediately," he was relieved as head of the department of family and community medicine at Rockford, based upon Salafsky's recommendation. B. also informed Levenstein that he recommended to Stukel that "dismissal procedures be commenced against you."

### 2. The Applicable University Statutes For Terminating a Faculty Member's Tenure

Article X, § 1, ¶ d of the University statutes states that due cause for dismissal exists if: "a faculty member's performance of University duties and functions or extramural conduct is found to demonstrate clearly and convincingly that the faculty member can no longer be relied upon to perform those duties . . ." Further, ¶ e (1) of the University Statutes sets forth the procedure the President must follow prior to commencing tenure termination proceedings:

> (1) Charges. When it shall appear to the president that cause of the dismissal of an appointee may exist, the president shall consult with the Faculty Advisory Committee ["FAC"]. The president, after such consultation, shall determine whether dismissal proceedings should be instituted. Charges looking to dismissal shall be preferred by statement in writing by the president or the president's designee and shall be filed with the clerk or secretary within thirty days after consultation with the Faculty Advisory Committee. The statement shall be sufficiently specific to reasonably inform the appointee of the nature of the charges and enable the appointee to present a defense to them.

11

Section 1, ¶ e (8) governs the president's power to reassign a tenured member while considering their dismissal:

(8) Reassignment of Duties.  Under exceptional circumstances, and when such action is clearly necessary and justified, the president may direct that a faculty member be relieved of some or all of the faculty member's University duties and functions and reassigned to others, without prejudice and without loss of compensation, pending the final decision of the case, subject to the following provisions: (a) the president may reassign duties before the filing of any charges only after giving notice to the chair or, in the absence of the chair from the University to some member of the Faculty Advisory Committee, that the president believes that cause for dismissal may exist; (b) if the president reassigns those duties after so giving notice to the chair or some member of the Faculty Advisory Committee, such reassignment shall terminate within thirty days after that committee has made its recommendations to the president unless the president initiates dismissal proceedings by the filing of charges for dismissal within that thirty-day period; and (c) if the president initiates dismissal proceedings by filing charges for dismissal, the president may reassign duties or extend a previous reassignment of duties until the termination of those proceedings or until the effective day of dismissal if the proceedings should result in dismissal.

### 3.  Stukel Enters the Process

On January 2, 1996, while Levenstein was still serving the May 11, 1995 suspension, he wrote Stukel, beseeching him to terminate the suspension and allow him to return to work.  Levenstein expressed his frustration at being suspended unfairly and characterized the University's contemplation of whether to pursue termination hearings against him as a stunt designed to coerce him into resigning.  On January 9, Stukel replied, stating that the decision of whether to pursue termination proceedings was still pending.  Stukel advised Levenstein that he needed to complete his review of the case material and then seek the guidance of the FAC on how to proceed.  He urged patience, assured Levenstein that he viewed the matter "most seriously," but determined that "in the mean time, the status quo will continue."

12

In February 1996, the status quo changed when Broski reassigned Levenstein to the task of reviewing and critiquing--from home--medical video tapes, such as: "Lyme Disease, An Outdoor Menace;" "Lipid Consensus Conference;" "Persistent Vegetative State;" "The Quiet Touch – The Gift of Listening – The Gift of Understanding and The Gift of Comfort;" "Just Like You and Me."  Levenstein's protests to this reassignment went unanswered.

### 4.    The FAC's Advice and Counsel

On February 1, 1996, Broski forwarded Stukel a proposed draft of charges that he recommended for proceeding on the termination of Levenstein's tenured status.  On February 7, Stukel forwarded the draft charges to the FAC, requesting their opinion of them and seeking their advice and counsel.

On April 16, 1996, the FAC responded to Stukel.  Their report stated that although Stukel asked them to assume that the "allegations contained in the proposed chargers to be true," the FAC stated that the University Statutes require that "it is necessary for us to look beyond the four corners of the charges in order to properly answer your questions."

This aspect of their role was significant to the FAC for at least two reasons. First, while the charges of sexual harassment against Levenstein were "highly material to his capacity to perform," they did not go "to the issue of his basic abilities, which most conclude are entirely satisfactory."  Secondly, the FAC was "also concerned" about Levenstein's charges of financial improprieties and believed that the charges of sexual harassment against him could not "be viewed solely without regard to the mileau in which they have arisen."  Thus, the evidence suggests that the FAC suspected that the

13

business of Levenstein's termination was limited to his inquiries about perceived financial irregularities.

In their report, the FAC stated that there was "no room for serious contention" but that "several" of the charges against Levenstein were valid. Nevertheless, the FAC expressed its uncertainty of the strength of the evidence of sexual harassment against Levenstein. Specifically, they stated that "in good conscience, we cannot, even for purposes of giving you advice, simply assume all the charges to be true . . . it appears to us that, in at least some cases, the evidence already garnered is not particularly persuasive, nor the conduct, if proved, necessarily wrongful." (emphasis theirs)

The FAC's most significant "problem" with the case against Levenstein was whether it proved that his "future performance . . . will be professionally substandard." That is, whether the evidence of Levenstein's past conduct "clearly and convincingly" predicted that he would be unable to perform his duties. On this score, the FAC stated that "we advise that the standard would not be met on this record . . ." First, the FAC considered "that those closest to this investigation," meaning the AAP and particularly Adams, "believe that the nature of the claims of misconduct against Levenstein may be appropriately addressed through a plan of remediation." In its judgment, the FAC stated that this recommendation did "not support Dr. Salafsky's contention that such an assignment cannot be implemented." The FAC clearly viewed with great reservation Salafsky's rejection of the AAP's recommendations:

> [I]n what we conclude to be rather summary fashion, [Salafsky and the appeal panel] have indicated that Dr. Adams' recommendations could not be implemented. We cannot credit Dr. Salafsky's contrary statement with great weight in advising you and certainly cannot conclude that his statement would meet the clear and convincing test if subjected to careful

14

scrutiny. The record which we have reviewed indicates that there are managerial disputes between Dr. Salafsky and Dr. Levenstein which may well give rise to bias on his part, leading in turn to an inference that his conclusions on remediation could be less than objective. This is reflected in what appears to us to be the overly aggressive approach he may have taken in the crucial time frame in early May, 1995 . . .

The FAC stated that while it considered Levenstein "unrepentant," it nevertheless "remain[ed] unconvinced that a meaningful effort ha[d] been made to correct Dr. Levenstein's likely errant conduct." It concluded its report to Stukel, by advising "that the charges and the surrounding circumstances as we have cited them above do not give rise to a finding favorable to a termination at this time." They suggested instead a reassignment of duties consistent with Adams' recommendations.

### 5. Levenstein Resigns

The University Statutes provided Stukel thirty days from the date he received the report of the FAC to decide whether to proceed with Levenstein's termination or terminate the suspension. On April 23, 1996, before the time period elapsed, Levenstein resigned. The evidence neither shows that someone alerted Levenstein that the report of the FAC was submitted, nor that Levenstein inquired if the report had been submitted.

His resignation letter to Stukel approaches the rhetorical histrionics of General Douglas MacArthur's 1951 farewell address to the joint session of Congress. In fairness though, it is important to note that he had served just shy of a year, in near idleness under Stukel's "status quo" regime. And by all indications, he was unaware that the FAC had just issued its report, supporting many of his arguments and recommending that he not be terminated. His letter reads in part: "I have persevered

15

for 11-1/2 months under the incredible burden of unsupported allegations and public humiliation in the hope that someone would listen to the truth. To be frank, you were my last hope . . . Four and a half months later, you appear to be no closer to bringing this matter to a close . . ." Levenstein contends that he saw no alternative but to resign, certain that the system had been rigged against him and that no resolution was in sight.

## II.    DISCUSSION

### A.    *Procedural Due Process Claim – Constructive Discharge Theory*

#### 1.    Deprivation of a Property Right

In their motion for summary judgment, defendants argue that Levenstein was not deprived of property without due process because he was suspended with pay. They contend that there is no property interest in the non-pecuniary aspects of employment. Furthermore, defendants argue that the evidence shows that the continued suspension of Levenstein was the appropriate way to proceed because there was a hazard of keeping him on the job. Since Levenstein resigned prior to the commencement pre-termination process, defendants argue that he waived his due process rights and has no right upon which to assert them now. The University characterizes Levenstein's departure as his preference to facing termination proceedings.

Levenstein counters that what the University describes as his voluntary resignation was, in fact, the result of his constructive discharge. Specifically, Levenstein argues that he was never given a choice between resigning or facing termination proceedings. Rather, Levenstein asserts that "Stukel had not decided whether to seek termination (and thus provide 'termination proceedings')" consistent

with Article X of the University Statutes despite the fact that the University had placed him on suspension for nearly a year. Levenstein argues that although he was suspended with pay, he was subjected to intolerable working conditions, withering on the suspension vine, given make-work assignments that were an "insult" to someone of his professional stature.

It is undisputed that as a member of the tenured faculty, Levenstein had a property right in his job under state law. *Levenstein v. Salafsky,* 164 F.3d 345, 351 (7th Cir. 1998); see *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694 (1972); see *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). Thus, under the Fourteenth Amendment, he is entitled to due process before being deprived of this constitutionally property interest. *Parrett v. City of Connersville,* 737 F.2d 690, 693-94 (7th Cir. 1984). Due process requires that a pre-termination hearing be held. *Cleveland v. Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487 (1985); *Schacht v. Wisc. Dep't of Corrections,* 175 F.3d 497, 502 (7th Cir. 1999), *receded from on other grounds by, Higgins v. Mississippi,* 217 F.3d 951 (7th Cir. 2000).

Suspension of an employee with pay pending the termination process does not violate a constitutional right. *Id.; Levenstein,* 164 F.3d at 351. In *Loudermill,* the Supreme Court of the United States held that suspension with pay of an employee with a constitutionally protected property interest was appropriate when the employer "perceives a significant hazard in keeping the employee on the job." *Id.* at 470 U.S. at 544-45, 105 S.Ct. at 1495. The Court also held that "[a]t some point," a delay in the termination process would become a constitutional violation. That determination rests

on whether the delay is unreasonably prolonged. *Id.* at 470 U.S. at 547, 105 S.Ct. at 1496. Thus, defendants' suspension of Levenstein with pay does not alone state a claim for the deprivation of a constitutionally protected right. That is not, however, the argument put forth in Levenstein's procedural due process claim.

When an employee has been constructively discharged, meaning that his working conditions were made so miserable that he was compelled to quit, he has suffered a deprivation of property, "and the only question would then be whether he was given due process of law." *Parrett.* 737 F.2d at 694. In *Parrett*,. the plaintiff was the chief of detectives on an Indiana town police force. He became involved in a forgery investigation which led to the daughter of one of the town's prominent citizens. The plaintiff and the father exchanged angry words over this, and the daughter was never prosecuted. A few years later, the father rose to a high office in the town and he asked the plaintiff to quit. The plaintiff refused, but the father did not let the matter end there.

The town eventually removed the plaintiff as chief, reassigning him to an inferior position albeit at the same pay. He was given a windowless office fashioned from a broom closet and he spent his shift with nothing to do. Eventually, when the enforced idleness was too much to bear, he suffered a breakdown and took medical retirement. The Seventh Circuit ruled that the plaintiff was constructively discharged when it was apparent to him that he would not be given any work to do. *Id.* at 694. The court held that the enforced idleness was a "humiliating counterpoint" to plaintiff's career that could have the effect of irrevocably damaging his professional skills: "For anyone with some self-respect the position that [defendants] placed [plaintiff] in was intolerable . . ." *Id.; see also, Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir. 1996)(a plaintiff alleging

18

constructive discharge must show that "conditions were so intolerable that a reasonable person would have been compelled to resign.") Therefore, the defendants in *Parrett*, through constructive discharge, had deprived the plaintiff of a constitutionally protected property right.

In *Tweedall v. Fritz*, 987 F.Supp. 1126, 1132 (S.D.Ind. 1997), cited by the defendants, the district court in the Southern District of Indiana held that paid suspension of a middle school teacher accused of sexual misconduct was appropriate to protect the investigation against him as well as preventing more similar conduct by the accused. In *Tweedall*, plaintiff allegedly inappropriately touched and made sexually-oriented remarks to his middle school students. After Tweedall was confronted about the allegations, the school's principal expressed concern that Tweedall's continued presence at the school could jeopardize the investigation. Shortly thereafter, the defendants suspended him with full pay and benefits pending the outcome of the investigation. The court ruled that the suspension did not abridge Tweedall's procedural due process rights since he retained his pay and benefits. Thus, the court reasoned, Tweedall's only concern was the "apparent stigmatization" from being suspended. *Id.* at 1132. The court held that while the stigma he suffered from the suspension was appreciable, the school "was faced with a need to protect middle school children from their teacher's sexual harassment." *Id.* Specifically, the court noted that the government had a substantial interest in protecting impressionable young students. Also, the court held that the immediate suspension was necessary to pursue the investigation and prevent Tweedall, if the accusations were true, from repeating

those actions. *Id.*

Tweedall argued that the suspension was a constructive discharge, stating that he suffered extreme psychological effects as a result. The district court held that the constructive discharge claim failed because no evidence suggested that the defendants intended for Tweedall to quit "or that their actions were calculated to bring about that result." *Id.* at 1134.

Defendants argue that this case is similar to *Tweedall* in that Levenstein's paid suspension was justified because it enabled the University to: conduct its investigation against him, hear Levenstein's appeal, and deliberate about whether to proceed with Levenstein's termination. Certainly, as *Loudermill* and *Tweedall* illustrate, sometimes circumstances dictate that an employee accused of sexual harassment should be removed from his position to expedite and protect the integrity of the investigation against him, as well as to protect those who might be the target of more inappropriate behavior. When viewed in a light most favorable to the plaintiff, however, the evidence in this case presents what the *Tweedall* court expressly held was absent – a triable issue of whether the suspension, as well as the conditions of Levenstein's reassignment, were imposed by defendants in bad faith --with the intention of forcing Levenstein to resign.

Specifically, genuine issues of fact remain about why Salafsky did not end Levenstein's suspension and reassign him consistent with the recommendations set forth by the AAP. In his May 11, 1995 letter, Salafsky indicates that the AAP's investigation and recommendations would influence the course of Levenstein's future at

the University. Yet, when the investigation concluded the following July, Salafsky did not follow their recommendations to allow Levenstein to return to the classroom and hospital. Instead, the terms of the suspension went unchanged and for more than nine months after the investigation concluded, Levenstein was forbidden to see patients or conduct class. Additionally, the evidence shows that while the University was deciding whether to pursue Levenstein's termination, he was given old medical training videos to watch and critique. For a physician with Levenstein's reputation, defendants, by both forbidding him to advance his professional career and assigning him work for which he was extremely overqualified to perform, raises the issue, as it did in *Parrett*, whether his nearly one-year long suspension constituted a constructive discharge.

     2.    Denial of Due Process

Defendants' argue that even if Levenstein was deprived of a property interest, he still received sufficient due process prior to his resignation. Defendants point out that Levenstein received notice of the charges against him, an explanation of the employer's evidence, and an opportunity to be heard. Therefore, defendants contend that they provided Levenstein with the essential elements of due process. However, because he resigned before Stukel decided whether to proceed with pre-termination proceedings, he waived his right to the pre-termination process and cannot complain that he was not afforded procedural due process. Levenstein counters that the entire process, regardless of whatever the methods the University Statutes assured, was a "kangaroo court," engineered by the defendants to run him out of the University.

A claim of violation of procedural due process requires that a plaintiff not only show that he has been deprived of a property right, but also that he was denied due

process of law. *Parrett,* 737 F.2d at 694. However, even if an accused is given notice of the charges and the evidence against him, "if the charges are a sham through and through, there has not been a constitutionally sufficient opportunity to respond." *Levenstein,* 164 F.3d at 351. Fair procedure requires an unbiased decisionmaker. *See e.g.,Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011 (1970); *Schacht,* 175 F.3d at 502; *Doe v. Board Educ. of Oak Park & River Forest High Sch. Dist. 200,* 115 F.3d 1273, 1283 (7th Cir. 1997) Therefore, the court cannot grant the defendants' motion if a genuine issue of fact exists to support Levenstein's contention: that his suspension was the result of defendants' animus and its procedures a sham.

Defendants argue that allegations of sham proceedings require a plaintiff to demonstrate proof that the alleged misconduct was so outrageous as to "shock the conscience," citing to *Schacht's* discussion of the required quantum of proof to maintain that actions of state officials violated a plaintiff's substantive due process rights. 175 F.3d at 502. On the other hand, the court in *Schacht* held that allegations of procedural due process violations "offers explicit textual protection against a sham set of procedures used to deprive someone of a protected property interest" which guarantees "fair procedures in an unbiased decisionmaker," to ensure "honesty in the process." *Id.* The Seventh Circuit did not hold that unfairness or the existence of bias in a procedural due process claim can only be demonstrated by evidence that shocks the conscious. In *Schacht,* the plaintiff's procedural due process claim eventually failed because he did not "present record evidence sufficient to create a genuine issue of material fact" that the defendants conspired against him, and used the pre-termination process "as a

22

vehicle for achieving their illicit goals." *Id.* at 504. Thus, a "factual basis" to support allegations of procedural due process violations is required; but not proof that shocks the conscience. *Id.*

Viewed most favorably to Levenstein, the evidence shows that he could maintain that defendants were biased, wanted to see him leave the University, and that the process was a stacked deck against him. "No matter how complete the panoply of procedural devices which protect a particular liberty or property interest," the Seventh Circuit holds, "due process also requires that those procedures be neutrally applied." *Ciechon v. City of Chicago,* 686 F.2d 511, 517 (7th Cir. 1982). Given that Levenstein vociferously challenged Salafsky on what he believed to be fiscal mal/misfeasance at Rockford, the evidence allows Levenstein to pursue his claim that defendants were biased. Salafsky's recommendation to Broski, which set the wheels in motion on the road to Levenstein's termination, is counter to the primary recommendation given to him from the AAP's report. Levenstein could make the argument that Salafsky's stated reason that Adams' recommendation did not account for the fact that Levenstein would have to have one-on-one contact with students and patients if he returned was simply pretext for wanting him dismissed. How could it be, Levenstein might argue, that after a two-month long investigation by the AAP, Salafsky could honestly think that it would never have dawned on Adams, while pondering her recommendation, that Levenstein would have occasion to be exposed to students, nurses, and patients if he was allowed to return to the classroom and hospital? Yet, Salafsky's letter to B. implies that the AAP's report, if not faulty, at least did not thoroughly consider the consequences of its recommendations.

To be sure, Salafsky was not bound by the recommendations, and Adams carefully stated that Levenstein should be removed if a feasible arrangement for Levenstein to remain could not be devised. Yet Salafsky's letter to Broski, which essentially brushed aside the recommendations, breathes life into Levenstein's suspicions that Salafsky was motivated primarily by wanting to see him dismissed from the University. The FAC certainly implied as much in its report to Stukel, when it said that Salafsky's recommendation appeared "overly aggressive." Its report was unquestionably suspicious of Salafsky's zealousness to have Levenstein remain suspended even after the thorough investigation counseled otherwise. Thus, the court rules that there exists a triable issue here – whether bias against Levenstein spoiled the process. For these reasons, the court cannot grant the defendants' motion.

B.    *Equal Protection Claim*

Defendants also attack Levenstein's equal protection claim on the basis of selective prosecution. Defendants contend that Levenstein cannot identify any similarly situated person/s, identical in all respects to him who have been treated more favorably. Moreover, defendants contend that in the time Levenstein was employed at the University, four other tenured administrators who were the subject of sexual harassment allegations were treated similarly to him.

Selective prosecution "violates the equal protection clause 'where the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion.'" *Levenstein,* 164 F.3d at 352; *quoting Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir. 1995). In *Esmail*, the Seventh Circuit held "[i]f the power of government is brought to bear on a harmless individual

24

merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court." 53 F.3d at 179.

The Seventh Circuit noted, when reviewing the sufficiency of his pleadings, that "Levenstein has alleged malice and a motive to retaliate against him personally because of his belief that certain financial transactions needed to be reviewed and that his superiors might be covering up financial irregularities. That is enough to put his case squarely into the pattern we recognized in *Esmail*." *Id.* at 353. Now at the summary judgment phase, if Levenstein supports with evidence the allegations of defendants' malice, he may pursue the equal protection claim on the basis of selective enforcement. The court finds that the evidence provides enough support for Levenstein to survive summary judgment on this issue. Whether he was correct or not, it appears that Levenstein was vocal about what he perceived as financial irregularities under Salafsky's watch. While Levenstein's suggestion that Salafsky manufactured a sexual harassment case against Levenstein where the basis for one did not otherwise exist, seems far-fetched and is not supported with credible evidence. However, the issue remains whether, once Salafsky was advised of the complaints against Levenstein, that he maliciously proceeded full throttle in the direction of pursuing his dismissal -- over the recommendations of the University's investigatory body, the AAP. Thus a narrow opening for Levenstein to proceed with the selective prosecution claim survives; specifically addressing Salafsky's disregard for the AAP's counsel, his decision not to lift the suspension once he received it, and his recommendation of dismissal to Broski over the AAP's judgment.

C.    *Defendants' Qualified Immunity Argument*

Finally, defendants' argue they are entitled to qualified immunity from liability as individuals.  Generally, public officials are entitled to qualified immunity from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 350. Whether a public official may be held personally liable turns on an objective legal standard and "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated.  Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton,* 523 U.S. 574, 588, 118 S.Ct. 1584, 1592 (1998); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, (1982); *Townsend v. Vallas,* 256 F.3d 661, 672 (7th Cir. 2001).

The Seventh Circuit has held that actions for personal liability turn on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Vallas,* 256 F.3d at 672 (quotations omitted).  To be "clearly established," *Vallas* articulated, "the contours of a right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right." *Id.;* see *Anderson v. Creighton.* 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).

When evaluating a claim of qualified immunity, the Seventh Circuit counsels a court to "first determine whether the plaintiff has alleged the deprivation of an actual

constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Vallas,* 256 F.3d at 672.

Above, the court has concluded that Levenstein has demonstrated sufficient evidence to survive summary judgment on his two constitutional claims: the procedural due process claim and the equal protection claim. However, Levenstein completely fails to support his argument that any of the individual defendants should have known that they were allegedly abridging his constitutional rights. Instead, he cites to the Seventh Circuit's opinion which reviewed his case for the *sufficiency of the pleadings* under Fed.R.Civ.P 12. He argues that "until all genuine issues of material fact are resolved at trial," the Seventh Circuit's ruling bars a finding of qualified immunity. This argument flies in the face of the purpose of summary judgment. Even the portion of the Seventh Circuit's opinion he quotes in his response brief includes the following: "We decided today only that, for the purposes of the motion for failure to state a claim, the district court properly denied the University defendants' claim of qualified immunity . . ." *Levenstein,* 164 F.3d at 353. At the summary judgment phase, Levenstein is required to support his arguments with evidence, including a response to the defense of qualified immunity. For these reasons, the defendants' motion is granted on this issue in favor of the individual defendants.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED in part and DENIED in part. The motion is GRANTED for the individual defendants and against Levenstein. However, defendants' motion is DENIED with respect to Levenstein's constitutional claims. IT IS SO ORDERED.

Blanche M. Manning, U.S.D.J.

**Dated:** 2-4-02